UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

DANIEL CHAVEZ

                              Plaintiff,


        -against-


CITY OF NEW YORK, ERIC ADAMS,
DAVID CHOKSHI

                              Defendants

**COMPLAINT**

Case no. 1:23-cv-7754
Jury Trial:  ☒Yes ☐No

1

PRELIMINARY STATEMENT

Daniel Chavez was at the apex of his career when Defendants ripped it away from him. He has a master's degree in business administration and holds a graduate degree in instructional design. Mr. Chavez's job was to make Rikers Island a better, safer, more equitable place. He was well on his way to fulfilling his objective. Defendants had other plans though.

Rikers Island is one of the most notorious jails in the country. It is plagued with violence. Staff and inmates alike, have been victims of the violence. It is also unique because the vast majority of people detained in New York City are housed there. The problems that plague Rikers Island are in part, a result of overcrowding, poor training, and staff shortages. As of October 2023, the City of New York (City or NYC) plans on replacing Rikers Island with a more modern correctional system. [1] Thus, the City recognizes the plethora of issues with Rikers Island.

Corrections officers face unique issues. Mr. Chavez's job was to create and deliver educational content intended to provide solutions. His specialized graduate degree in instructional design helped prepare him for the herculean task. The principles of instructional design consider how educational content should be designed, developed, and delivered to adult employees, across any industry sector, depending on their educational needs. Mr. Chavez excelled at designing, creating, and delivering educational solutions for corrections officers.

---

[1] https://rikers.cityofnewyork.us/ (last accessed October 10, 2023).

Mr. Chavez modernized training in the Correction Academy by using evidence-based instructional strategies. He helped teach corrections officers how to handle conflict with inmates by providing them with alternative, non-violent solutions. Further, Mr. Chavez helped implement a project titled Outward Mindset. The objective of Outward Mindset was to teach staff to view inmates as people. Not a number. Mr. Chavez's success did not go unnoticed. In 2020, he was promoted to Assistant Commissioner of New York City's Department of Corrections (NYCDOC) Training and Development Division.

As the Assistant Commissioner, Mr. Chavez made groundbreaking changes. He was responsible for the instructional design and strategy of training curriculum that replaced the Department's solitary confinement program. In addition, Mr. Chavez integrated the Training Division with the Programs Division. Prior to that, they had been operating independently. Thus, Corrections Officers were previously trained in a vacuum. Mr. Chavez's intervention fostered better curriculum—and therefore superior training—because he paired training with programs to further the NYCDOC's initiatives. Ultimately, staff and people in custody benefited. Next, Mr. Chavez helped train Corrections Officers' have better interactions with marginalized members of society detained at Rikers Island.

For instance, Mr. Chavez developed courses covering topics such as the dual role of the corrections officer, the LGBTQ+ community and gender-based violence, and unit management. These courses all shared common goals of increasing awareness of the needs of those in custody, reducing violence, and increasing compliance through

proper self-regulation. Mr. Chavez was making Rikers Island a safer, more equitable institution. But he was just getting started.

In March of 2021, Mr. Chavez was looking outside his office window. He saw overgrown grass, weeds, and neglect. Most people would not think anything beyond the unsightly view. However, Mr. Chavez is not like most people. Mr. Chavez was able to see beyond what was in front of him. He saw an opportunity to improve morale and mental health. On his own initiative, Mr. Chavez went outside into the cold winter air, and cleaned up the space. He pulled out weeds and removed debris. Why? Because he saw potential as opposed to failure. What began as an idea blossomed into a Department wide initiative.

Eventually, staff from several different units came together and turned the once neglected space into a therapeutic garden. Together, they planted new bushes, trees, and flowers. They installed benches and chairs for staff as well. The therapeutic garden was received with great enthusiasm. News 12 even covered the groundbreaking ceremony. [2]

Daniel Chavez approached his career with a sense of purpose. He valued the opportunity to effectuate change beyond an institutional level. His career fulfilled his passion to improve society. Mr. Chavez chose his specific career path because there is no better place to help the most broken and downtrodden members of society than in the most notorious jail in the country. Mr. Chavez viewed those housed in Rikers Island the same way he viewed the neglected space outside his office. That is, Mr.

---

[2] https://bronx.news12.com/nyc-community-cleans-up-rikers-island-garden-for-staff

Chavez saw great potential in an environment that most people had given up on. He brought humanity to a place bereft of it. He brought equality without compromising safety. Most importantly, he brought his unique perspective. Rikers Island was a better place because of it. Mr. Chavez's bright, beacon of light was extinguished prematurely though. Defendants had political and personal agendas.

Mr. Chavez became just another casualty in Defendant's war against every working-class person who refused to comply with their arbitrary, nonsensical mandate(s) against COVID-19 (Mandate or Vaccine Mandate). A Mandate that did not further anything related to public health.  The Mandate was never about protecting the public. It was about forced compliance and monetary gain. The mandate was built on a broken foundation of inequality. Eric Adams cracked the foundation entirely by excluding professional athletes and performers from the purview of the Mandate.

Allegedly a lifelong public servant, Eric Adams created a real-life recitation of "A Tale of Two Cities". In his version though, public servants like Mr. Chavez were the peasants. As such, the "rules" were only enforced against them. In a city controlled by Eric Adams, measures taken under the guise of furthering public health are decided by socioeconomic status and employment.

Daniel Chavez's entire life trajectory was altered because of two men who grossly abused the power the public trusted them with. Power that must be exercised in accordance with the United States and New York State Constitutions but were not.

The federal and State Constitutions were an afterthought to Defendants. Few things are more antagonistic to the Constitution than the Mandate.

Mr. Chavez no longer has the opportunity to follow his career path. Mr. Chavez worked hard over the last ten (10) to fifteen (15) years to become the Assistant Commissioner of NYDOC's Training and Development Division. Defendants obliterated his hard work in an instant. The only employment Mr. Chavez could find was as a, seasonal, pool attendant in a small, New Jersey hotel. Mr. Chavez was not welcome to work in Eric Adams' version of New York City. Accordingly, Mr. Chavez brings this action against the City of New York, Eric Adams, and David Chokshi.

<u>PARTIES</u>

1. Daniel Chavez was at all relevant times herein employed by the New York City Department of Corrections (NYCDOC) and the City of New York. Mr. Chavez is a United States citizen.

2. At all relevant times herein Defendant New York City is a municipal entity created and authorized under the laws of the State of New York, with its principal offices located at the Municipal Building, One Centre St., New York, NY 10007.

3. At all relevant times herein, Eric Adams was the Mayor of the City of New York, was acting under color of law, and was responsible for executing, and enforcing the Vaccine Mandate. Mayor Adams is responsible for setting and overseeing the policies of the City, and the way they are maintained, applied, and enforced. Eric

Adams acted at all times under color of law in the acts attributed to him herein. Mayor Adams' office is located at 1 City Hall, New York, NY 10007.

4.  At all relevant times herein, David Chokshi was acting under color of law as the Commissioner of the New York City Department of Health and Mental Hygiene (DOH) and created the Vaccine Mandates. David Chokshi was at all times relevant hereto responsible for creating the vaccine mandates, disseminating information regarding COVID-19 to the public, overseeing the New York City Department of Mental Health and Hygiene, and creating all public health policies. David Chokshi was appointed by the Mayor of the City of New York.

## JURISDICTION AND VENUE

5.  This Court has original jurisdiction pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

6.  The United States District Court for the Eastern District of New York is the proper venue pursuant to 28 U.S.C. §1331 (b)(1) and (b)(2) as it is the judicial district in which Defendants deprived Plaintiff of his rights under the Constitution of the United States and it is where a substantial part of the events giving rise to Plaintiff's claims occurred.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

7.  Plaintiff received a right to sue letter from the Equal Employment Opportunity Commission (EEOC) on July 20, 2023. The right to sue letter is hereby attached as Exhibit 1.

## STATEMENT OF FACTS

8. Mr. Chavez was the Assistant Commissioner of the NYCDOC Training & Development Division.

9. In March 2020, a new severe respiratory virus spread throughout the world. It is known as SARS-CoV-2 (Virus). The sickness it causes is known as COVID-19.

10. Every day, thousands of people died from COVID-19 in 2020.

11. Mr. Chavez still worked through the height of the pandemic.

12. On approximately March 10, 2020, NYCDOC directed all staff to submit to daily temperature checks and to affirm that they did not have any COVID-19 related symptoms. (Chavez Aff. ¶ 22).

13. As an essential employee, he reported daily to either the NYCDOC Correction Academy at 6626 Metropolitan Ave, in Queens or to the field office on Rikers Island (*id.* at ¶23).

14. Each day upon arrival, Mr. Chavez checked in at a screening desk to have his temperature taken (*id.* at ¶24).

15. Mr. Chavez completed a form indicating that he had no COVID-19 related symptoms (*id.*).

16. When Rikers Island was reopened to non-uniformed staff in September 2020, Mr. Chavez worked almost exclusively out of his office located in the George Motchan Detention Center on Rikers Island (Chavez Aff. ¶¶ 25, 27).

17. Plaintiff followed the same procedure of temperature testing and affirming he had no COVID-19 related symptoms (*id.* at ¶26).

18. Mr. Chavez routinely came into contact with staff and people in custody (*id.* at ¶¶ 28-31).

19. Luckily, by March 2021, the Virus had mutated into a much weaker strain.

20. The death toll sharply declined.

21. In June 2021, then Governor Cuomo ended New York's declared state of emergency.

22. In August of 2021, then Mayor Bill De Blasio issued Executive Order No. 78. This Order required City employees to either show proof of vaccination or to submit proof of a negative COVID-19 PCR test (*id.* at ¶¶ 37-38).

23. Executive Order No 78 went into effect on September 13, 2021 (*id.*).

24. The fall of 2021 was completely different than the fall of 2020. Significantly less people were dying from COVID-19.

25. In September 2021, the Food and Drug Administration (FDA) granted the first Biologics License Application (BLA) for any COVID-19 vaccine. A pharmaceutical company named Pfizer-BioNTech (Pfizer) developed and manufactured a vaccine (Vaccine or COVID Vaccine). Other vaccines remained available under emergency use authorization.

26. Defendants touted the Vaccine as safe and effective.

27. The Vaccine was never intended to stop the transmission of the Virus.

28. Alternatively, the Vaccine—at best—targeted only the original, Alpha strain of the Virus.

29. Nevertheless, Defendants told the public that the vaccine would prevent COVID-19.

30. Defendant Chokshi appeared on radio advertisements and television commercials encouraging everyone to get vaccinated.

31. Chokshi gave out broad sweeping medical advice to the public for the first time in recent history. Prior to 2022, people relied on their primary care physicians for individualized, medical advice. Chokshi normalized "one size fits all" medical advice which did not account for individual needs.

32. As of October 2023, the COVID-19 "vaccine" is nothing more than another optional, seasonal shot.

33. It never was the panacea Defendant's falsely claimed it to be.

34. Mr. Chavez complied with Executive Order No. 78, by submitting proof of negative PCR tests for COVID-19 (Chavez Aff. ¶ 39).

35. On or about, October 20, 2021, Chokshi Ordered Plaintiff—as well as every City worker— to get vaccinated against COVID-19 (Mandate).

36. The Mandate cited Executive Order No. 78 as support.

37. The Mandate continued then Mayor De Blasio's Executive Order Number 225 titled the "Key to NYC."

38. Chokshi Ordered that any City employee who failed to get vaccinated by October 29, 2021, would—as a penalty—be excluded from their workplace beginning on November 1, 2021.

39. Chokshi ordered only City employees to get the shot.

40. Before issuing the Mandate for all City employees, Chokshi first mandated only Department of Education (DOE) "employees, contractors, and visitors" to provide proof of COVID-19 vaccination before entering any DOE building. Then Chokshi Ordered all "staff of early childhood programs" to provide proof of vaccination on September 12, 2021. Thus, the Order issued on October 20, 2021, was the third proclamation mandating vaccination.

41. Defendant Chokshi however, delayed enforcement of the Mandate for uniformed Corrections Officers employed by the New York City Department of Corrections who were not assigned to "posts in healthcare settings."

42. Chokshi postponed the deadline for NYCDOC uniformed members to November 30, 2021.

43. Until then, uniformed members were able to "provide proof of a negative COVID-19 PCR diagnostic test."

44. Chokshi cited "a staff shortage at the Department of Corrections ("DOC") facilities" as the reason for postponing the deadline to comply.

45. The Mandate allowed workers to request medical and religious accommodations.

46. The Mandate did not apply to anyone else at that time.

THE MANDATE DID NOT FURTHER THE ENDS OF PROTECTING PUBLIC HEALTH.

47. The purpose behind the Mandate was to protect the public from the transmission of COVID-19.

48. Salus populi[3] expresses a common law principal for the City's exercise of police powers.

49. The premise is simple: the government can restrain individual liberties to the extent it is related to furthering the ends of preventing harm to other citizens.

50. The Commissioner of the New York City Department of Health and Mental Hygiene unquestionably has the power to mandate vaccinations pursuant to the New York City Charter, the New York City Health Code, the Administrative Code of the City of New York, and the New York State Public Health Law.

51. The Commissioner does not however, have the power to target a small minority of the population for vaccination against a virus that exists in every conceivable public place people gather.

52. But that is exactly what he did.

53. Naturally, if the Vaccine stopped the transmission of SARS-CoV-2, NYC would have a compelling interest to mandate everyone living and working there to get vaccinated. And if the Vaccine resulted in even mild side effects, then the benefit to the public would outweigh the risk to the individual.

54. Except, the Vaccine did not, and does not, stop the transmission of the Virus.

55. It did not slow the spread of COVID-19.

56. It did not prevent COVID-19.

57. It did not potentially save lives.

58. It did not protect public health.

---

[3] Salus populi is Latin for the "welfare of the people."

59. It did not promote public safety.

60. The risk of contracting COVID-19 is omnipresent in every public place.

61. It is not specific to workplaces.

62. Defendants never—nor could it—proved that the Vaccine stopped transmission of the Virus, that it saved lives, protected public health, or promoted public safety.

63. Relatedly, Defendants never showed how the Virus presented a risk isolated to the workplace as opposed to any other public place where people gather.

64. Nevertheless, Chokshi and Adams arbitrarily required only City employees to get vaccinated.

## VACCINE INEFFICACY

65. The Virus infects all human beings.

66. People who were fully vaccinated became sick with COVID-19.

67. These are known as "breakthrough cases."

68. Pfizer, and other pharmaceutical companies manufactured additional vaccines—in the form of booster shots—to stop the occurrence of breakthrough cases.

69. Defendants still encouraged the public to get booster shots in addition to the original vaccine.

70. Booster shots did not, and do not, stop the spread of the Virus either—including its variants.

71. Chokshi himself contracted COVID-19.

72. Despite being fully vaccinated and "boosted" multiple times, President Biden, Dr. Anthony Fauci, and Centers for Disease Control Prevention Director Rochelle Walensky still contracted COVID-19.

73. COVID-19 Vaccines generally utilize new technology through Messenger RNA (mRNA). The mRNA is injected into the human body and instructs the body's cells to build spike proteins found on the surface of the Virus.

74. COVID-19 Vaccines are completely different than traditional vaccines.

75. Prevalent breakthrough cases do not exist for measles, mumps, rubella, and polio in people who have had received vaccination or gained natural immunity.

76. If the Vaccine prevented COVID-19, then booster shots a few months after receiving the original dose would be unnecessary.

77. If the Vaccine prevented COVID-19 there would be no breakthrough cases.

78. If the Vaccine prevented COVID-19, then Pfizer would not have stated the vaccine was never tested to prevent the transmission of COVID-19. [4]

79. The Vaccine is not a vaccine at all, it is a shot—like the flu shot.

80. Any efficacy that the Vaccine did have waned after a few months.

81. Chokshi still publicly claimed that "authorized vaccines protect us from diseases that threaten us so much more" than the side effects.[5]

---

[4] https://apnews.com/article/fact-check-pfizer-transmission-european-parliament-950413863226 (last retrieved March 24, 2023). Linked material is provided throughout  SOLELY to demonstrate to this Court that Plaintiff has a good faith basis to assert said claims. Given the plethora of competing information, Plaintiff cannot ascertain what this Court has been privy to, or what it has not. Plaintiffs do not intend, in any way, to submit the materials herein as substantive proof, nor to track a course for summary Judgment.
[5] https://www.nytimes.com/live/2021/04/14/world/covid-vaccine-coronavirus-cases (last retrieved March 31, 2023).

82. Chokshi and Adams knew that breakthrough cases for individuals inoculated for the Measles, Mumps, Rubella and Polio, are nonexistent.

83. Further, second, third, and fourth, boosters are not required for the aforementioned traditional vaccines.

84. Because—unlike COVID-19 Vaccines—they work.

85. The Vaccine could not stop the transmission of the multitude of variants that had emerged such as the Delta or Omicron strains.

86. Yet, Chokshi—in support of the Mandate—stated that ". . . new variants of COVID-19, identified as 'variants of concern' have emerged in the United States, and some of these new variants which currently account for the majority of COVID-19 cases sequenced in New York City, are more transmissible than earlier variants."

87. A 2020 study published in the New England Journal of Medicine concluded that the Vaccine was safe and effective.[6] The study however, noted that "[n]o vaccines that protect against betacoronavirus are currently available, and mRNA-based vaccines have not widely been tested" (*id.*). The study was funded by Pfizer and BioNTech. Even more, the data set and trial results used by the study's authors were the basis for "an application for emergency use authorization." (*Id.*).

88. Chokshi and Adams mandated Mr. Chavez to receive a vaccine that could not stop the transmission of the "variants of concern" Chokshi referenced in the Mandate.

---

[6] https://www.nejm.org/doi/full/10.1056/nejmoa2034577# (last accessed October 14, 2023).

89. A concept known as herd immunity protects the public from outbreaks of disease.

90. Herd immunity is where a sufficiently large proportion of a population becomes immune to an infectious disease, either through vaccination or previous infection, thereby reducing the spread of the disease within the community.

91. The rationale behind compulsory vaccination is embedded in the theoretical underpinning of herd immunity. It posits that when a large portion of the population is immune to a disease, it becomes difficult for the disease to spread because the chances of an infected person coming into contact with a susceptible person are reduced. This means that even those who are not immune to the disease, such as individuals who are unable to get vaccinated due to health reasons, are less likely to become infected because the disease has fewer opportunities to spread within the community.

92. That is, in part, because vaccinated individuals do not become infected when exposed to the virus they are vaccinated against.

93. Herd immunity is particularly important for protecting vulnerable members of the population, such as those who are immunocompromised, and for preventing outbreaks of infectious diseases. The exact percentage of the population that needs to be immune to achieve herd immunity varies depending on the disease and how contagious it is, but generally, it is estimated that between 70% and 90% of the population needs to be immune to a disease to achieve herd immunity.

94. According to the CDC over 85% of residents in the City were fully vaccinated by April 2022.

95. Yet, the Mandate was enforced against only City employees—like Plaintiff.

96. City employees make up a small, insignificant portion of the City's total population.

97. Over eight (8) million people live in the City.

98. Even if every single City Employee was vaccinated. And even if the Vaccine stopped the Virus from spreading. Herd immunity would still be unobtainable.

DOES NOT MEET CRITERIA

99. On October 27, 2021, Mr. Chavez submitted a request for a religious accommodation (Chavez Aff ¶41).

100. On or about November 10, 2021, the City denied Mr. Chavez's request for a religious accommodation (*id.* at ¶ 44).

101. The City did not question the sincerity of Mr. Chavez's beliefs (*see* Exhibit 2).

102. Instead, the City denied Mr. Chavez's request because accommodating him presented ". . .an undue hardship to the Department as it presents a direct threat to members of service, the public and those detained by the Department." (*Id.*).

103. The denial letter went on to explain—in sum and substance—that the Department's facilities often involved confined spaces. Thus, the Virus spread faster because people were in close proximity to one another and other preventative measures such as social distancing were not practical. Plaintiff does not contest this.

104. The City further stated that "[a]symptomatic transmission of COVID-19 is possible; an individual can transmit COVID-19 to others unknowingly and

without symptoms. Therefore, masks and weekly testing may be insufficient to control the spread of COVID-19 in the Department. Getting vaccinated will help the Department fulfill its mission of care, custody, and control. The CDC has indicated that you are less likely to contract COVID-19 and/or become seriously ill from COVID-19 if you are vaccinated." (*Id.*).

105.   Finally, the City explained that many non-uniformed Members of Service interact with uniformed Members of Service and detainees in non-jail settings. As such, non-uniformed Members of Service—like Plaintiff—could infect uniformed Members of Service, who then could introduce COVID-19 into the jail facilities (*id.*).

106.   The City, however, did not consider possible options in which it could accommodate Mr. Chavez. It did not engage in a dialogue with Mr. Chavez about possible accommodations.

107.   Additionally, coercing Plaintiff to get vaccinated for the benefit of others flies out the window since the Vaccination did not prevent COVID-19 from spreading.

108.   Plaintiff had three (3) days to file an appeal with the City of New York's Reasonable Accommodation Appeals Panel.

109.   He filed an appeal within three (3) days.

110.   On December 19, 2021, the City of New York's Reasonable Accommodation Appeals Panel denied his appeal (Chavez Aff. ¶48).

111.   The Appeals Panel simply stated that Mr. Chavez "did not meet criteria." (*see* Exhibit 3).

112.   It is unclear what that means since there is no way to discern what the alleged criteria was or how it was applied.

113.   This decision was final.

114.   Mr. Chavez was placed on leave without pay on December 29, 2021, and then terminated on February 11, 2022.

115.   By letter dated June 16, 2022, the City offered Mr. Chavez to return to work if he decided to get vaccinated.

116.   The City would reinstate him to his previous position with no change in title and the same salary, as if he never left.

117.   Alternatively, he was terminated on June 30, 2023.

PRIVATE SECTOR MANDATE NOT ENFORCED

118.   On or about, December 13, 2021, Chokshi extended the Vaccine Mandate to employees in the private sector.

119.   Eric Adams did not enforce the mandate as it applied to employees in the private sector.

120.   Eric Adams and NYC did not prevent unvaccinated private sector employees from going to work.

121.   Eric Adams and NYC did not fine private sector employees for not complying with the Mandate.

122.   The Mandate was selectively enforced against only City Workers like Plaintiff.

## DIFFERENT RULES CLASSIFIED BY EMPLOYMENT STATUS AND "VALUE"

123. On or about March 24, 2022, Adams issued Executive Order No. 62 (Executive Order or Order).

124. The Order exempted professional athletes and performers from the Vaccine Mandate.

125. The Order amended the Mandate to exclude professional athletes and performers.

126. Adams' justification was that they travel for work and benefit the City economically since they often attract many visitors to the City. Further, New York sports teams with stadiums in the City—said the Mayor—were at a competitive disadvantage since the away teams were able to field unvaccinated players. As such, the New York sports teams were at a disadvantage. Mr. Adams decided that requiring professional athletes to get vaccinated was detrimental to the city's economy and morale of the city's residents.

127. The Mandate did not apply to residents of the City either.

128. Indeed, Adams did not try to draw a nexus with the exclusions to furthering the ends of public health.

129. Instead, he explained that he made it for purely monetary reasons and to avoid setting a bad precedent.

130.   On March 4, 2022, a reporter asked Adams how it is fair that unvaccinated tourists could go into any indoor place they want, but unvaccinated City Workers were terminated and were not going to get their jobs back.[7]

131.   Adams explained—in sum and substance—that a court had decided it was fair *id.*

132.   When asked if he could just reinstate the terminated workers, Adams responded—in sum and substance—that most New Yorkers did the "right thing" and that it would send the wrong message to folks who got the shot if the Mandate was rescinded. Adams finished by stating "[p]eople have to comply with the rule." *Id.*

133.   Members of the public frequently interact with one another.

134.   Yet, no private sector workers or members of the public were required to be vaccinated.

135.   COVID-19 is not unique to the workplace.

136.   Chokshi himself acknowledged the obvious. He said "[w]e've seen how the coronavirus respects no boundaries. It doesn't respect geographic boundaries . . ."[8]

137.   Vaccination is permanent.

138.   It does not magically leave the body at the end of the workday.

139.   Coercing Plaintiff to get vaccinated for the benefit of others flies out the window since the Vaccination does not prevent COVID-19.

---

[7] https://www.nyc.gov/office-of-the-mayor/news/110-22/transcript-mayor-eric-adams-makes-announcement-covid-mandates (last retrieved March 31, 2023).

[8] https://www.ny1.com/nyc/all-boroughs/inside-city-hall/2020/08/05/new-nyc-health-commissioner-dr-dave-chokshi-taking-over-for-dr-oxiris-barbot (last retrieved March 24, 2023).

140.   When Mr. Chavez was not working, he was a citizen just like everyone else.

141.   Except he did not have the ability to choose whether to get vaccinated.

142.   Everyone else had a choice even though the risk of contracting COVID-19 was the same in every public place people gathered.

143.   Getting vaccinated would not protect, or benefit anyone else.

144.   The Mandate lacked the Salus Populi rational for the use of Defendants' police powers.

145.   Defendants cannot justify mandating vaccination for only public employees— while excluding the rest of the population.

146.   Defendants continued to enforce the Mandate until February 6, 2023.

<u>CAUSES OF ACTION</u>

<u>FIRST CAUSE OF ACTION</u>
**VIOLATION OF THE FOURTEENTH AMENDMENT**
**NY Const art. I §XI**
[Equal Protection Clause]
[Selective Enforcement]
(Against Defendants Adams and Chokshi)
<u>PURSUANT TO 42 U.S.C. §1983</u>

147.   Plaintiff repeats and re-alleges every allegation above as though fully set forth herein.

148.   The Fourteenth Amendment prohibits any State from denying to "any person within its jurisdiction the equal protection of the laws."

149.   NY Const art, I §XI states that "[n]o person shall be denied the equal protection of the laws of this state or any subdivision thereof. No person shall, because of race, color, creed, or religion, be subjected to any discrimination in his or her civil

rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state."

150.  42 U.S.C. §1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

151.  At the pleading stage, Plaintiff must only set forth facts plausibly showing that that (1) compared with others similarly situated, he was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person.

152.  To establish a violation under article I, §XI of the New York State Constitution, Plaintiff must plausibly show that the named Defendants' distinction between Mr. Chavez and the rest of the population was not rationally related to protecting the public health. Put differently, Plaintiff must plausibly allege that the defendants' classification scheme was arbitrary since the distinction between City employees and the rest of the population was not reasonably related to protecting the public health.

153.   Defendants Adams and Chokshi were the final policy makers for the City of New York and public health mandates for the City, respectively.

154.   The City is a municipality within the State of New York.

155.    Mr. Chavez is a United States citizen.

156.    Plaintiff is similarly situated in all material respect to every other human being living in New York City because the Virus infects all human beings and could be transmitted in any public place where people gather.

157.   The risk of infection is no different on a crowded City bus than it is in a crowded City jail cell.

158.   But only Plaintiff was forced to get vaccinated in his role as City Employee although he would not have to get vaccinated as a citizen. Thus he was treated differently than similarly situated individuals.

159.   Mandating City workers like Plaintiff to get vaccinated is illogical, arbitrary, and nonsensical.

160.   The Constitution mandates that in a City-wide outbreak, of a deadly Virus either everyone must get vaccinated, or no one gets vaccinated.

161.   Eric Adams exclusions demonstrated that the Mandate was never about public health.

162.   He did not even offer an explanation as to how the exclusions were related to public health.

163.   There is no explanation or justification.

164.   Considering, the Virus was not a workplace specific threat but instead was a risk present everywhere, the Mandate's application to only people in the workplace is per se arbitrary.

165.   Still, the Mandate lacked a rational basis to furthering the ends of protecting public health since vaccinating isolated individuals like Mr. Chavez does not establish herd immunity in a population of eight (8) million people since all City workers combined, make up less than 50% of the population.

166.   Further, making a distinction based on employment status is completely unrelated to protecting the public health since it is not connected to health, but rather employment status.

167.   Requiring only Plaintiff to get vaccinated does nothing to protect the public health even if the vaccination worked.

168.   However, the Vaccine did not succeed in stopping transmission of the Virus or its variants.

169.   Defendants have not—and cannot—provide a justification for requiring only City employees to get vaccinated.

170.   Thus, there is no conceivable reason in this universe that tethers the Mandate to furthering the public health.

171.   Accordingly, the Mandate violates the Equal Protection clause.

172.   Defendants were plausibly motivated by direct malice irrespective of vaccine efficacy. In a City with approximately 8.4 million residents Defendants decided that only City workers, such as Plaintiff, had to get vaccinated against a Virus

that could be transmitted anywhere, by anyone, at any time. During a global public health crisis involving a highly contagious airborne pathogen, the defendants let members of the public decide whether to get vaccinated without any penalty. But the same members of the public had no choice if their employer was the City of New York. For the first time in history, government policy makers compelled vaccination based on employment status. Thus, unvaccinated people in the City were punished only if they worked for the City. Even though, the City could not achieve herd immunity if every City worker were vaccinated.  Even though, vaccination is a permanent measure that does not go away at the end of the workday. Still, the named Defendants singled out Plaintiff. They exiled Mr. Chavez from his workplace. They took away Mr. his salary, pension, health benefits, esteem, and job security. Mr. Chavez paid a heavy price for refusing compulsory vaccination, while every other unvaccinated person paid no price at all. Arbitrarily ordering Plaintiff to get vaccinated and punishing him for being unvaccinated, is the epitome of malicious intent under these facts.

173.   In addition, the plausibility that Defendants were motivated by impermissible considerations or malicious intent skyrockets considering that the Vaccine—as alleged herein—does not stop the transmission of the Virus.

174.   Defendants knew that the Vaccine did not stop transmission but mandated it anyway. Knowledge is plausibly inferred from the facts averred herein.

175.   Since there is a complete absence of a rational basis, plus a plethora of inconsistent, arbitrary, illogical mandates, the only plausible motivation must be

driven by impermissible motives. It is binary. Either the motivation is permissible or impermissible. If there is no basis for permissible reasons then only impermissible reasons are left.

176.    The following arguments are in the alternative:

177.    One plausible impermissible discriminatory motive for Defendant Chokshi's selective enforcement is based on monetary gain.

178.    As an extremely accomplished individual, Dr. Chokshi knew that diseases like measles are stopped through natural immunity.

179.    Chokshi never considered valid bases to discount natural immunity for COVID-19.

180.    Dr. Chokshi did not consider countervailing evidence, or any scientific evidence that tended to disprove, conflict with, or casted doubt on his Orders.

181.    Chokshi has been recognized for increasing the NYC Department of Health and Mental Hygiene's budget to its highest level ever during COVID-19.

182.    Chokshi plausibly mandated only Plaintiff for purely political and monetary reasons. That is, to receive more funding.

183.    Meaning, the Mandate plausibly gave Dr. Chokshi the basis to increase funding to the NYC Department of Health and Mental Hygiene.

184.    Another plausible improperly motive was that Chokshi intended to further his own scientific research testing vaccine uptake.

185.   Chokshi subsequently co-authored a study examining the effects of his Mandate "among NYC municipal employees" regarding vaccine uptake. [9] That is, he studied whether the Mandate forced more municipal employees to get vaccinated. It is a study measuring obedience to coercive governmental interventions. It has nothing to do with furthering the public health. It is all about compliance.

186.   Chokshi first mandated DOE staff to get vaccinated. Then he Mandated all City employees.

187.   Chokshi rolled out his Mandates incrementally; until it covered the entire workforce.

188.   Chokshi's "piecemeal" Orders make even less sense, because it targeted smaller groups within the subpopulation of City workers.

189.   As a public servant, Chokshi knew that leveraging Plaintiff's livelihood against the Mandate increased the probability of compliance.

190.   City workers benefit from enhanced job security. They are guaranteed a set pension and other benefits upon retirement.

191.   Hence, the likelihood of compliance in this population is substantial.

192.   Choksi plausibly did so to test his hypothesis and measure outcomes in real time.

---

[9] https://www.healthaffairs.org/doi/epdf/10.1377/hlthaff.2022.00809 (retrieved March 24, 2023).

193.    Chokshi was plausibly improperly motivated an intent to secure a large class of test subjects since who would unwittingly participate because they would lose their livelihood otherwise.

194.    Another plausible, impermissible motivation was socioeconomic based discrimination [10]

195.    It is therefore plausible that Chokshi used Plaintiff—and other City employees—to test the efficacy of public health measures intended to increase vaccine uptake, which then could be utilized in in lower class communities.

196.    Framed differently, Chokshi was motivated by an intention to discriminate against Plaintiff based on his socioeconomic class, for the benefit of folks from a different socioeconomic class.

197.    Chokshi has not provided any evidence that only vaccinating City workers furthers the ends of stopping the spread of the Virus. Nor could he.

198.    Alternatively, Chokshi was motivated by his ambition to enhance his own status both personally, and professionally.

199.    Chokshi acted in violation of clearly established federal law.

200.    Chokshi deprived Plaintiff of equal protection under the law.

201.    Chokshi's conduct further shocks the conscience because he played God with people's lives; arbitrarily deciding that City workers would lose it all for not taking the shot, while groups of people he cared more about were spared. Indeed, he made

---

[10] *see e.g.* https://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2020.00928 (retrieved October 17, 2023).
*** Please note that Plaintiff is not opining or commenting on Mr. Chokshi's pursuits, other than that they are noble and important. However, pursuing noble goals at the expense of others is unconstitutional, unlawful, and unethical.

Plaintiff an unwitting participant in his research to benefit another group of people.

202.   As far as Eric Adams, his impermissible motives are more obvious.

203.   At the threshold, in a real public health emergency, there are no exceptions based on factors unrelated to likelihood of spreading transmission.

204.   Adams said, and insinuated that Plaintiff was not "following the rules." Thus his motive was vindictive. To punish Plaintiff for not following his edict.

205.   Ending the mandate—according to Adams—would send the wrong message, and essentially reward Plaintiff for "not following the rules."

206.   Thus, Adams selectively enforced the Mandate against Plaintiff based on a vindictive motive.

207.   Next, Adams was motivated purely by economic and social considerations. Which are also impermissible.

208.   Adams explicitly stated the economic justification in support of Executive Order No. 62.

209.   Adams was motivated by generating revenue for NYC at Plaintiffs expense. Unvaccinated Plaintiff could not work in the City, but unvaccinated professional athletes and performers could because according to Adams, they generate greater revenue for the City.

210.   Relatedly, Adams was motivated by an intention to discriminate against Plaintiff based on socioeconomic status.

211.   Consequently, Adams created a social hierarchy made from the mold of a caste system.

212.   For instance, Brooklyn Nets basketball player Kyrie Irving declined the shot.

213.   Irving even turned down a four-year contract worth over one hundred million dollars because it required him to be vaccinated per the Mandate. [11]

214.   Notably, Irving said he felt stigmatized for his decision *id.*

215.   Eric Adams solved Irving's dilemma with Executive Order No. 62.

216.   Adams' audaciously exempted elites like Mr. Irving while continuing enforcement against working class Plaintiff.

217.   Discrimination motivated by socioeconomic status or class is impermissible.

218.   Discrimination motivated by an intention to make more money for the City is equally impermissible.

219.   Alternatively, and in addition to, Adams' also had a bad faith or malicious intent to injure Plaintiff.

220.   Malicious Intent can be inferred from the natural and probable consequences of a person's conduct. For instance, a person intends to cause physical injury to another person if he or she hits another person with a weapon.

221.   Analogously, the natural and probable consequences of terminating Plaintiff is substantial harm to his livelihood.

222.   Adams knew that the Vaccine did not stop the transmission of COVID-19.

223.   Eric Adams is a career public servant.

---

[11] https://www.espn.com/nba/story/_/id/34672230/gave-4-year-100m-plus-extension-unvaccinated (retrieved January 24, 2023)

224.   Adams was consciously aware that ending Plaintiff's career would harm him individually.

225.   Thus, malicious intent is directly supported by Adams' carve outs, and selective enforcement of the Mandate.

226.   It is also supported by his continued enforcement of it until February 2023 and his statement that he was punishing everyone who did not do "the right thing."

227.   Adams was also plausibly motivated by self-preservation.

228.   After years of touting a vaccine as "safe and effective," claiming that it stopped transmission, running constant ads, and telling the public to get vaccinated, Eric Adams—along with Chokshi—have influenced an enormous amount of people to get the shot.

229.   Adams' continued the same vaccination campaign since he took office.

230.   Adams' political image would be damaged if he acknowledged countervailing evidence.

231.   Chokshi's image would suffer as well, and he would lose all credibility.

232.   Chokshi would experience—as Plaintiff did—what it feels like to be viewed as a hero one day, and a villain the next.

233.   Adams and Chokshi therefore ignored evidence that contradicted their assertions to preserve their political and public images.

234.   For example, bivalent boosters are not even effective. *See* e.g., <u>Bivalent COVID-19 Vaccines—A Cautionary Tale,</u> The New England Journal of Medicine, [published January 11, 2023].[12]

235.   Adams still claims it is.

236.   Chokshi and Adams claimed to review all the scientific evidence. However, they only reviewed what fit their narrative.

237.   Public perception of the Mayor's performance is vital to his career.

238.   These motives are impermissible.

239.   Another plausible impermissible motive is that Adams was fiscally motivated to enrich the City by cutting jobs. Terminating Plaintiff, and thousands of City workers relieved the City of its obligation to pay their salaries, health benefits and pensions. Terminating Plaintiffs saved the City millions of dollars.

240.   Eric Adams and Defendant Chokshi deprived Plaintiffs of the equal protection of the laws.

241.   Eric Adams and Defendant Chokshi acted in violation of clearly established federal law. Law that has been well settled since Reconstruction.

242.   Defendant Adams' conduct shocks the conscience as well.

243.   Adams' enforcement—or lack thereof—of the Mandate was not rationally related to furthering the public health under any conceivable circumstance. Even worse, Adams never pretended that the exceptions he created were related to furthering public health. Neither did Chokshi.

---

[12] https://www.nejm.org/doi/full/10.1056/NEJMp2215780 (last accessed January 23, 2023).

244.   Accordingly, Defendants issuance and enforcement of the Mandate violated the Fourteenth Amendment's Equal Protection Clause and NY Const art. I §XI. This violation proximately caused Plaintiff to be harmed.

SECOND CAUSE OF ACTION
**Violation of Title VII**
[Failure to Reasonably Accommodate]
(Against NYC)

245.   Plaintiff repeats and re-alleges every allegation above as though fully set forth herein.

246.   Under Title VII it is an unlawful employment practice for any employer to ". . .discharge any individual, or otherwise discriminate against any individual with respect to his compensation terms, conditions, or privileges of employment, because of such individual's . . .religion" 42 U.S.C. §2000e-2(a)(1).

247.   In addition, under Title VII, Defendant was required to show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business.

248.   At the threshold, Defendants denial was universal. Under the City's reasoning no religious accommodation could be made for anyone. Therefore, the City violated Title VII entirely since it never was going to accommodate Plaintiff.

249.   Alternatively, the City's reasonable accommodation process was illusory.

250.   Defendants were required to do more than consider potential accommodations, but it did not even do that.

251.   Plaintiff showed that he had bona fide religious belief conflicting with employment when he submitted his application for a religious accommodation.

252.   Defendants did not questions the sincerity of his belief. Thus, it cannot question it now.

253.   Plaintiff also informed  NYC in his application for a religious accommodation that his religious beliefs conflicted with the Mandate.

254.   Further, the City of New York Reasonable Accommodation Appeals Panel only provided its basis for denying Mr. Chavez's appeal as "did not meet criteria." This is no explanation at all.

255.   Since the denial of Mr. Chavez's appeal was final, he challenges the final decision made by the City of New York Reasonable Accommodation Appeals Panel.

256.   Plaintiff was terminated for failing to comply with the Vaccine Mandate and the Mandate conflicted with his religious beliefs.

257.   Defendants' explanation of "does not meet criteria" falls far short of what it was required to demonstrate.

258.   Defendant did not meet its burden of showing that granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business.

259.   Consequently, Defendant failed to provide a reasonable accommodation in violation of Title VII.

THIRD CAUSE OF ACTION
**VIOLATION OF THE FOURTEENTH AMENDMENT**
[Substantive Due Process]
(Against Defendants Chokshi and Adams)
PURSUANT TO 42 U.S.C. §1983

260.  Plaintiff repeats and re-alleges every allegation above as though fully set forth herein.

261.  Plaintiff has a fundamental right to pursue the profession of his choosing.

262.  As applied, Plaintiff's career training Corrections Officers at Rikers Island is synonymous with his chosen profession.

263.  Rikers Island is not like any other jail in New York State.

264.  Plaintiff could not find similar opportunities in any other jail in the country.

265.  Plaintiff, for example, does not have the opportunity in other jails to work closely with such a substantial number of marginalized members of society as he did in Rikers Island.

266.  The people housed in Rikers Island is as diverse as the population of New York City.

267.  Plaintiff worked hard for over a decade to pursue a career at Rikers Island. Not another jail, or jails in general.

268.  Defendants deprived Plaintiff of his fundamental liberty and property right to pursue his chosen profession by issuing the Mandate and enforcing it against only Plaintiff.

269.  Defendants have a compelling interest to take measures that protect the public health.

270. The Mandate, however, was not narrowly tailored to furthering its compelling interest.

271. Plaintiff was terminated for not complying with the Mandate.

272. The Mandate was the proximate cause of Plaintiff's termination.

273. Accordingly, as applied to Mr. Chavez, the Mandate violated his substantive due process right to pursue a career of his choosing.

274. Defendants proximately caused Plaintiff's injury.


<u>REQUEST FOR RELIEF</u>

<u>First Cause of Action</u>

Plaintiff seeks compensatory damages, damages for backpay, front pay, punitive damages, and attorney's fees in an amount exceeding $500,000.00 to be determined by a jury after trial.

<u>Second Cause of Action</u>

Plaintiff seeks damages for backpay, front pay, attorney's fees, other monetary damages incidental thereto, and non-economic damages in an amount exceeding $200,000.00 to be determined by a jury after trial.

<u>Third Cause of Action</u>

Plaintiff seeks compensatory damages and other monetary damages incidental thereto, and attorney's fees in an amount exceeding $500,000.00.

## CERTIFICATION & CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Dated:      October 17, 2023
            Uniondale, NY

Respectfully Submitted,

CHAD J. LAVEGLIA ESQ.,
LAW OFFICE OF CHAD J LAVEGLIA PLLC
626 RxR Plaza, Suite #613
Uniondale, NY 11556
(631) 450-2468
claveglia@cjllaw.org