1

```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF NEW YORK
  - - - - - - - - - - - - - - - - X
                                   :
     DANIEL CHAVEZ,                :   23-CV-7754(BMC)
                                   :
              Plaintiff,           :
                                   :
                                   :   United States Courthouse
        -against-                  :   Brooklyn, New York
                                   :
                                   :
     CITY OF NEW YORK, ERIC        :   November 29, 2023
     ADAMS, DAVID CHOKSHI,         :   10:00 a.m.
                                   :
              Defendants.          :
                                   :
  - - - - - - - - - - - - - - - - X

  TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE/ORAL ARGUMENT
              BEFORE THE HONORABLE BRIAN M. COGAN
                  UNITED STATES DISTRICT JUDGE


                    A P P E A R A N C E S:


  For the Plaintiff:   LAW OFFICE OF CHAD J. LAVEGLIA PLLC
                           350 Motor Parkway, Suite 308
                           Hauppauge, New York 11788
                       BY:  CHAD J. LAVEGLIA, ESQ.


  For the Defendants:  NEW YORK CITY LAW DEPARTMENT
                           100 Church Street
                           New York, New York 10007
                       BY:  TRACI KRASNE, ESQ.


  Court Reporter:      KRISTI CRUZ, RMR, CRR, RPR
                       Official Court Reporter
                       Email: kristi.edny@gmail.com


  Proceedings recorded by computerized stenography.  Transcript produced by
  Computer-Aided Transcription.


                       *     *     *     *     *
```

*Kristi Cruz, RMR, CRR, RPR*
*Official Court Reporter*

*Proceedings* 2

1         (In open court.)
2         THE COURTROOM DEPUTY: Chavez versus City of New
3 York.
4         Counsel, note your appearances, beginning with
5 plaintiff.
6         MR. LAVEGLIA: Chad LaVeglia, L-A-V-E-G-L-I-A,
7 350 Motor Parkway, suite 308, Hauppauge, New York 11788, for
8 Mr. Chavez.
9         Good morning, everyone.
10        MS. KRASNE: Traci Krasne, 100 Church Street, New
11 York, New York 10007, with the New York City Law Department,
12 here for defendants.
13        THE COURT: Okay.
14        This is both the initial status conference in the
15 case and also oral argument on the defendant's motion to
16 dismiss.
17        I have some questions for the plaintiff, so let me
18 start with you, Mr. LaVeglia. It seems to me one of the
19 things that you want out of this lawsuit is for me to
20 determine that the city's response to COVID-19 was
21 pointless, that it was not necessary, that it really didn't
22 achieve anything.
23        Are you going for that?
24        MR. LAVEGLIA: I'm not, Your Honor. It's actually
25 to the contrary.

1          We're saying that as a factual matter, and rather
2   we established the plausibility that in 2021 -- we're not
3   talking about 2020 or criticizing the city in general.  But
4   rather in 2021, after then-Governor Cuomo declared the state
5   of emergency to be over, by the time that Chokshi instituted
6   the vaccine mandate, it was evident that it either didn't
7   work or, say it did work, even then, that by selectively
8   choosing people like plaintiff who are employed by the city,
9   it's not rationally related to further any public health
10  goal.  So it's really either all or nothing.
11             THE COURT:  Okay.  That helped me.
12             So when you talk about selective enforcement in
13  Count One, are you talking about selective enforcement
14  against city employees with religious convictions, or are
15  you talking about selective enforcement against all city
16  residents with religious convictions?
17             MR. LAVEGLIA:  I'm just talking about city
18  employees.  I don't even think that we need to make the
19  distinction of religious convictions.  Rather, and I use
20  Jacobson and KCF to really illustrate this, Your Honor, that
21  in times of -- when there's an outbreak of a disease that
22  spreads across the entire city, it affects everyone the
23  same.  So to selectively just choose out of the population
24  of the city people that are employed by the city, it makes
25  no sense.  But even beyond that, it's discriminatory.

*Proceedings* 4

1    Let's take Jacobson, for example.  In Jacobson,
2 there was an outbreak of smallpox in Cambridge,
3 Massachusetts.  What Adams and Chokshi did here would be
4 analogous to, in Jacobson, if in Cambridge they decided to
5 pick people based on their employment.  Imagine they chose
6 just, hey, anyone who works for the City of Cambridge, you
7 have to get vaccinated, even though it's an outbreak across
8 the entire city.
9    THE COURT:  Well, that's what we have, in effect.
10 So I understand the analogy you're making.
11    But, in fact, isn't there an argument that the
12 City has greater control and responsibility for its own
13 employees?  It's not as if it said all restaurants and only
14 restaurants have these restrictions.  It started with its
15 employees.
16    MR. LAVEGLIA:  Yes, Your Honor.  I think as a
17 general matter, the City, of course, does have greater
18 control over its employees.  However, there is a line that
19 they crossed here.  The role between employer and their
20 governmental function is blurred here because, again, it's
21 an outbreak that is across everywhere and it's not related
22 to employment.  COVID-19 is not specific to the workplace,
23 as the Supreme Court held or found in its per curiam opinion
24 in *NFIB v. OSHA*.
25    THE COURT:  Okay.  It seems to me, though, you're

*Proceedings* 5

1   kind of turning the Supreme Court's decision in Inquis, if
2   I'm pronouncing it right, on its head, where the Supreme
3   Court said it didn't want to second-guess personnel
4   decisions undertaken by municipalities or states.  And, in
5   fact, it's not going to introduce a rational basis test to
6   determine whether that municipality had acted appropriately
7   because it didn't want to become a super-personnel
8   department.  So arbitrary treatment of an employee is not
9   really a ground for a selective enforcement claim.
10              MR. LAVEGLIA:  Yes, Your Honor.  If I may respond.
11              I agree.  I don't think that it turns Inquis on
12  its head, though, because we have the discrimination here.
13  There's also a bit of a caveat, too.  This isn't just a pure
14  personnel decision.  We're not talking about, say,
15  reassigning Mr. Chavez from one position to the next.  In
16  those types of context, of course it makes absolute sense
17  that no court should be second-guessing personnel decisions
18  like that.  But this is not a personnel decision.
19              Also, we have the discrimination here, which of
20  course is a necessary element, and plaintiff has plausibly
21  alleged many numerous grounds for discrimination.  We can
22  start with Eric Adams' exemption.  Again, the defense makes
23  these distinctions without a difference; employment or
24  professional athletes aren't employers.  It doesn't matter.
25  This is, again, a virus that is everywhere; it affects

Proceedings 6

1 everybody.

2 And even alternatively, when the mandate did
3 apply, even in their own scheme of things, to the private
4 sector and professional athletes and performers, Eric Adams
5 didn't enforce it.  He didn't enforce it at all towards the
6 private sector, and then he exempted professional athletes
7 like Kyrie Irving, who plays in a crowded basketball stadium
8 and is touching other people.  And his basis was, well,
9 these guys didn't follow the rules, et cetera, as we pled.
10 And that's plausible and must be determined by a jury.

11 THE COURT:  But you seem to be starting from the
12 point that any economic motivation that the city had as a
13 basis for exempting certain groups, like performers and
14 athletes -- which I agree with you, it's pretty obvious that
15 that's what it was -- somehow increases the
16 unconstitutionality of what they did.

17 But doesn't the City have to go ahead and balance
18 economic harm to the city versus the communicable nature of
19 the disease and decide where to draw those lines?  I mean,
20 is it really that the City is bound by an all-or-nothing and
21 can't take into account economic harm?  I mean, you say
22 consideration of economic harm equates to malice.  Is that
23 really the case?

24 MR. LAVEGLIA:  Your Honor, no, not in such a
25 general sense.  Of course the City can balance a tradeoff in

*Proceedings* 7

1  policy here.  But when a communicable disease is present
2  everywhere like it is here, to exempt people just based on
3  their status and you're picking winners and losers, I think
4  that is malice, because if Mr. Chavez was, say, a player on
5  the Nets, then he'd be exempt, and he's not.  He's a city
6  employee.  He wasn't born to be seven foot tall or
7  six-foot-five.  He's not a professional athlete.  So --
8             THE COURT:  But again, there's a reason for that,
9  right?  I mean, you know, with all due respect to
10 Mr. Chavez, he doesn't bring in as much money to the city as
11 visiting basketball teams, right?  So it's not like they
12 were out to get Mr. Chavez.  They were out to save
13 $100 million or more for the city.  Is that so wrong?
14            MR. LAVEGLIA:  Yes, Your Honor, that is very wrong
15 in the context of COVID-19, because the whole justification
16 for COVID-19, for this mandate, was to stop the spread of
17 it, stop the transmission of it.  It's a deadly virus.
18 People are dying.  People are getting sick.  We want to stop
19 the transmission of it.  So to exempt professional athletes
20 because they bring in more money, yes, that absolutely is
21 malice.
22            THE COURT:  Okay.  But still, you have to admit,
23 don't you, that that kind of exemption, while it does not
24 completely protect against COVID-19, what it does is raises
25 the risk of communicable disease at the benefit of having an

Proceedings 8

1  economic return, right?  Isn't that what's going on?  You
2  know, in theory they could have said no one's leaving their
3  houses, we are at an economic shutdown, everyone in your
4  house, don't go anywhere, use Instacart if you want food.
5  Well, they didn't do that.  So they took the next step.
6  They said, okay, here's the requirements, but we're going to
7  carve out performers because that's just too much money to
8  relinquish.  Why is there a Constitutional line that's drawn
9  in making those economic decisions?
10             MR. LAVEGLIA:  Well, Your Honor, I think that the
11  disparate treatment there, again, for one, it has no
12  rational basis to furthering public health.  Again, we've
13  got to put this in context a little bit, as well.  Chokshi,
14  in the private sector mandate, made it applicable to the
15  professional athletes and performers.  Eric Adams, though,
16  stepped over him and just exempted them for these economic
17  reasons.  Yeah, sure, it sounds like a policy consideration
18  that the City could and should make in certain
19  circumstances, but here it's to the detriment of Mr. Chavez
20  and thousands of other people.  Then when confronted with
21  it, Mayor Adams says, well, they have to follow the rules.
22  So it really is a tale of two cities, and Mr. Chavez lost
23  his career for it.
24             THE COURT:  It seems to me your weakest claim is
25  the substantive due process claim of the 14th Amendment,

Proceedings                                                                 9

1   because really to get there, you've got to tell me it's just
2   shocking that anyone could do this.  I've got to tell you,
3   I'm not so shocked.  It may have been wrong what the city
4   did, but again, it wasn't that the mayor did this in order
5   to get himself a contract for a lot of money, okay?  Or
6   something like that.  He was trying to do what he thought
7   was best for the city.  He may have balanced it wrong.  He
8   may have balanced it ineffectively.  He may have made wrong
9   decisions.  But it's not the kind of -- I mean, it seems to
10  me it would pull us back to the Lochner ages if I said this
11  is a substantive due process violation, don't you think?
12              MR. LAVEGLIA:  I do, Your Honor.  I would conceit
13  with that point.
14              THE COURT:  All right.
15              Let me ask the defendants a couple of questions.
16              First, about the Title VII claim, I don't think
17  you can just say undue burden and that's the end of it.  You
18  know, the plaintiff has pled, and we're only at the 12(b)(6)
19  stage, the elements necessary for a failure to accommodate
20  claim, and all I know that happened at this stage, limiting
21  myself to the face of the complaint, is that when he asked
22  for something, they said, no, it would pose an undue burden.
23  Well, I've got to determine that.  That's a question for
24  discovery, isn't it?  We know that in some city agencies
25  there was remote work that was done, accommodations were

*Proceedings* 10

1 made. That's intensely factual.
2          MS. KRASNE: Well, Your Honor, the City's position
3 is that in the decision with respect to plaintiff's
4 accommodation request, it stated what the undue burden is,
5 which was that it could not have an employee who is
6 unvaccinated in contact with the public, with people
7 detained by the DOC, and with coworkers. The risk of that
8 would have been an undue burden to the city --
9          THE COURT: Are there no administrative workers
10 for the DOC? Nobody can work remotely? Everybody's got to
11 be in a jail facility? You know, I don't know the answer to
12 that question. You probably don't know the answer to that
13 question at this point, which illustrates all the more
14 reason why we've got to get into the weeds on it. It seems
15 to me a blanket policy of no accommodations, it might be
16 necessary. It might be the only thing the City could do.
17 But on a 12(b)(6) motion, how can I determine that?
18          Okay. I don't want to put you more on the spot
19 than the question obviously does.
20          Here's what I'm going to do. I'm going to deny
21 the motion as to the first claim for relief, the selective
22 enforcement claim, and the Title VII claim, Claim Two. I'm
23 going to grant the motion as to Claim Three, the substantive
24 due process claim.
25          So that's my ruling on the motion, and I think

*Proceedings* 11

1  that the questions that I've asked both sides illustrate my
2  basis for doing that.
3             MR. LAVEGLIA:  Thank you, Your Honor.
4             MS. KRASNE:  Thank you, Your Honor.
5             (Matter adjourned.)

7                         *   *   *

9                    CERTIFICATE OF REPORTER

11  I certify that the foregoing is a correct transcript of the
12  record of proceedings in the above-entitled matter.

14   /s/ KRISTI CRUZ
    _____
15   Kristi Cruz, RMR, CRR, RPR
     Official Court Reporter